## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Travel Leaders Leisure Group, LLC, d/b/a Cruise Specialists,<br><br>           Plaintiff,<br><br>v.<br><br>Cruise & Travel Experts, Inc., Thomas Baumann, Bonnie Childs, Lynne Cox, Debra Dickerson, Michelle Boots, and Mary Ellsworth,<br><br>           Defendants. | Case No. 19-cv-02871 (SRN/ECW)<br><br>**MEMORANDUM OPINION AND ORDER** |

Danielle Fitzsimmons, Gregory J. Stenmoe, and Samuel N. Louwagie, Taft Stettinius & Hollister LLP, 200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Plaintiff.

Andrew Peterson, Joel D. O'Malley, and Katie M. Connolly, Nilan Johnson Lewis PA, 250 Marquette Avenue South, Suite 800, Minneapolis, MN 55401, for Defendants Cruise & Travel Experts, Inc., Thomas Baumann, Bonnie Childs, Lynne Cox, Debra Dickerson, Michelle Boots, and Mary Ellsworth.

Daniel S. Gross and Richard E. Spoonemore, Sirianni Youtz Spoonemore Hamburger PLLC, 3101 Western Avenue, Suite 350, Seattle, WA 98121, for Defendant Cruise & Travel Experts, Inc.

SUSAN RICHARD NELSON, United States District Judge

This matter comes before the Court on Defendants Cruise & Travel Experts, Inc.'s, Thomas Baumann's, Bonnie Child's, Lynne Cox's, Debra Dickerson's, Michelle Boots', and Mary Ellsworth's Motion to Dismiss for Lack of Personal Jurisdiction  (Doc. No. 24).

For the following reasons, the Court grants in part, and denies in part without prejudice, Defendants' Motion.

## I.    BACKGROUND

### A.    The Parties

Plaintiff Travel Leaders Leisure Group, LLC (TLLG), which does business as Cruise Specialists (CS) and will generally be referred to as CS in this order, is a Delaware corporation with a principal place of business in Minnesota.  (Compl. [Doc. No. 1] ¶ 1; *see also* Scrivanich Decl. [Doc. No. 38] ¶ 3.)[1]  CS is a luxury travel agency specializing in selling luxury cruises and tours; it has done so since 1987.  (Compl. ¶ 25.)  Given its tenure, CS has developed significant experience in the cruise sales industry, and its clients are typically high net-worth individuals.  (*Id.* ¶¶ 26–28.)

Defendant Cruise & Travel Experts, Inc. (CTE) is a Michigan corporation with a principal place of business in Michigan.  (*Id.* ¶ 2.)  CTE is also a luxury travel agency specializing in selling luxury cruises and tours, and directly competes with CS.  (*Id.*)  CTE was formed in September 2014.  (*Id.* ¶ 65; *see also* Baumann Decl. [Doc. No. 28] ¶ 12.)

Defendant Thomas Baumann is a citizen of Florida, the former president of CS, and the founder and owner of CTE.  (Baumann Decl. ¶¶ 1, 5, 12; Compl. ¶¶ 4, 42–43, 65.)

---

[1]    Because this matter is before the Court on a motion to dismiss for lack of personal jurisdiction, the Court "view[s] the evidence in the light most favorable to the plaintiff and resolve[s] all factual conflicts in its favor in deciding whether the plaintiff has made" the required "prima facie showing that personal jurisdiction exists . . . ."  *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (citations omitted).

Defendant Bonnie Childs is a citizen of Washington, a former cruise consultant for CS, and a current cruise consultant for CTE.  (Compl. ¶¶ 5, 13, 66, 68, 72; Childs Decl. [Doc. No. 30] ¶ 1.)

Defendant Lynne Cox is a citizen of Michigan, a former cruise consultant for CS (at which time she lived in Washington), and a current cruise consultant for CTE.  (Compl. ¶¶ 6, 13, 66–67, 72; Cox Decl. [Doc. No. 31] ¶ 1.)

Defendant Debra Dickerson is a citizen of Washington, a former cruise consultant for CS, and a current cruise consultant for CTE.  (Compl. ¶¶ 7, 13, 66, 69, 72; Dickerson Decl. [Doc. No. 32] ¶ 1.)

Defendant Michelle Boots is a citizen of Oregon, a former cruise consultant for CS, and a current cruise consultant for CTE.  (Compl. ¶¶ 8, 13, 66, 70, 72; Boots Decl. [Doc. No. 29] ¶ 1.)

Defendant Mary Ellsworth is a citizen of Washington, a former cruise consultant for CS, and a current cruise consultant for CTE.  (Compl. ¶¶ 9, 13, 66, 71, 72; Ellsworth Decl. [Doc. No. 33] ¶ 1.)

Collectively, the Court will refer to Childs, Cox, Dickerson, Boots, and Ellsworth—all cruise consultants at various times for CS and CTE—as the "Employee Defendants."

### B.   Factual Background

### 1.   Cruise Specialists and Employee Defendants

Cruise Specialists was formed in 1987 in Seattle, Washington.  (Compl. ¶ 25.)  Each of the Employee Defendants was hired by CS as cruise consultants, and were responsible for selling cruise reservations, servicing high-value CS clients, and consulting on

insurance, hotel, and other amenity options for those clients. (*Id.* ¶ 39.) CS hired Childs

in 1997, Cox in 2000, Dickerson in 2001, Ellsworth in 2004, and Boots in 2006. (*Id.* ¶ 13;

*see also* Childs Decl. ¶ 2; Cox Decl. ¶ 2; Dickerson Decl. ¶ 2; Ellsworth Decl. ¶ 2; Boots

Decl. ¶ 2.)

CS generally spends approximately one year with a prospective client in order to

develop a relationship with them before ever booking any travel for that client. (Compl.

¶ 30.) That approach allows CS to compile comprehensive data on the prospective client's

preferences. (*Id.*) That data is placed into what CS calls its "Confidential Luxury Customer

Database" (CLC Database), which serves as the "playbook" for CS. (*Id.* ¶¶ 30–31.) The

information in the CLC Database is apparently not publicly available and is used by CS to

give itself a competitive advantage within the industry. (*Id.* ¶¶ 32–33.) Cruise consultants

working for CS are given access to the CLC Database while working for the company. (*Id.*

¶ 34.)

Over the course of their time at CS, the Employee Defendants either worked in CS's

Seattle office or from their homes. From 1997 through 2007, Childs worked out of CS's

Seattle-based office, then switched to working from her Washington home. (Child Decl.

¶¶ 3.1–3.3.) Cox worked out of CS's Seattle-based office for the entire duration of her

employment with CS. (Cox Decl. ¶¶ 4–5.) Dickerson worked in CS's Seattle-based office

from 2001 to 2008, then switched to working from home in Washington. (Dickerson Decl.

¶¶ 2–3.1.) Similarly, Ellsworth worked in CS's Seattle-based office from 2004 to 2007,

then switched to remote work out of her home in Washington. (Ellsworth Decl. ¶¶ 3.1–

3.2.) Finally, Boots worked from her home in Oregon for the entire duration of her

employment with CS.  (Boot Decl. ¶¶ 3–3.1.)  Four of the five Employee Defendants have either never been to Minnesota or have only been in the state on a flight layover.  (*See* Boots Decl. ¶ 14; Cox Decl. ¶ 14; Dickerson Decl. ¶ 14; Ellsworth Decl. ¶ 14.)  The only Employee Defendant to have visited Minnesota in any other respect, Childs, did so when attending an employee engagement event in April 2005, unrelated to any of the claims asserted by Plaintiff in this lawsuit.  (Childs Decl. ¶ 14.)

While employed by CS, the Employee Defendants were issued computer hardware and software to be used by them in their role as cruise consultants, although the parties dispute whether that equipment originated from Minnesota or Seattle.  (*Compare* Childs Decl. ¶ 7–8; Cox Decl. ¶ 7–8; Dickerson Decl. ¶ 7–8; Ellsworth Decl. ¶ 7–8; Boots Decl. ¶ 7–8, *with* Scrivanich Decl. ¶ 10.)  Similarly, Plaintiff contends that each Employee Defendant ultimately reported to Dave Zitur, CS's Chief Information Officer and Chief Operating Officer, who was based out of Minnesota.  (Compl. ¶ 12.)  However, each Employee Defendant claims they never communicated with anyone by that name at any time during their employment with CS, and that they instead reported to other supervisors. (Childs Decl. ¶ 4–6; Cox Decl. ¶ 4–6; Dickerson Decl. ¶ 4–6; Ellsworth Decl. ¶ 4–6; Boots Decl. ¶ 4–6.)  Plaintiff also alleges that for the past twelve to fifteen years, most of CS's essential functions, such as its electronic network (including its servers), its human resources functions, and its payroll, benefits, and sales contracts have all originated out of Minnesota for the benefit of the company's employees.  (Scrivanich Decl. ¶¶ 6–8.) Moreover, Plaintiff contends that CS's employment policies and practices—which governed the company's employees—were issued from or designed in Minnesota, and all

legal and public relations functions for the company operated out of Minnesota.  (*Id.* ¶¶ 8, 13–14.)

> ### 2.   Sale of Cruise Specialists and Creation of Non-Competition/Non-Disclosure Agreements and Conditions of Employment/Confidentiality Agreements

In 2004, Carlson Companies began efforts to acquire CS.  (*See* Compl. ¶ 41.)  At the time, Defendant Baumann was employed by Carlson Leisure Group—a wholly owned subsidiary of Carlson Companies—as Executive Vice President for the Vacation and Business Travel Division and was responsible for running "company owned" travel agencies and acquiring new travel agencies.  (Baumann Decl. ¶ 2.)  Baumann worked from Michigan, but had an office in Minnesota that he occasionally used.  (*Id.*)  In his role, Baumann became involved in Carlson Companies' effort to purchase CS.  (Compl. ¶ 41; Baumann Decl. ¶ 4.)  Eventually, Carlson Companies acquired CS, effective January 1, 2005.  (Compl. ¶ 41, 55; Baumann Decl. ¶ 4.)  Following the acquisition, CS was run by Carlson Leisure Group, and Baumann became President of CS.  (Compl. ¶¶ 41–43.)

Plaintiff alleges that Baumann, as President, had CS cruise consultants sign two agreements as a condition of their employment with Carlson Companies: a Non-Compete/Non-Disclosure Agreement, and a "Conditions of Employment" Agreement (together, the "Employment Contracts").  (*Id.* ¶¶ 42–44.)  The Employee Defendants all signed the Conditions of Employment Agreement, and all but Boots signed the Non-Compete/Non-Disclosure Agreement.  (*See* Compl. ¶¶ 45–49; Compl. Exs. A–H [Doc. No. 5]; *see also* Childs Decl. ¶ 15.2; Cox Decl. ¶ 15; Dickerson Decl. ¶ 15.2; Ellsworth Decl. ¶ 15; Boots Decl. ¶¶ 15.1–15.2.)

6

The Non-Compete/Non-Disclosure Agreement—identical for all Employee Defendants—contains several relevant provisions.  Each Employee Defendant (except Boots) agreed that they would "[n]ot disclose or use, except as necessary in [their] employment . . . and not to use in any way which may be contrary to Carlson Leisure Group's interest or direction, during or at any time after termination of [the employee's] employment with Carlson Leisure Group . . . any confidential, proprietary or trade secret information of Carlson Leisure Group or any of Carlson Leisure Group's clients."  (Compl. Ex. A.)  They also agreed that for 12 months after their employment with Carlson Leisure Group terminated, they would not, in competition with Carlson Leisure Group, "offer or sell or assist in the offer or sale of any products or services to any actual or prospective client or account that [they] had involvement with in connection with" their work for Carlson Leisure Group in the two year period immediately prior to their termination.  (*Id.*)  Finally, each employee acknowledged that Carlson Leisure Group employee information, confidential vendor information, and confidential client information—including "price, contract provisions, names of contacts, proposals, plans and other specific information"—constituted confidential, proprietary and trade secret information.  (*Id.*)  Each Employee Defendant who signed a Non-Compete/Non-Disclosure Agreement acknowledged within the agreement that its terms would be governed by Minnesota law, and that the document's terms were "reasonable" and would "not prevent [the employee] from working in [his or her] area of expertise within the industry."  (*Id.*)

The Conditions of Employment Agreement also contains provisions relating to confidential information.  In signing it, the Employee Defendants acknowledged that they

would be "acquir[ing] confidential and secret data, information and knowledge concerning

Carlson, Carlson's customers and other third parties in various phases of their businesses,"

and that each employee was in a position of trust with respect to such information."

(Compl. Ex. B. ¶ 1.)  That information included:

> [I]nformation of and about customers and suppliers; customer lists, names of
> customer contacts and personnel, customer contracts (including, but not
> limited to, pricing and termination dates thereof) and purchase information;
> policies and procedures for estimating charges and billing customers;
> computer programs, mailing and other address lists, methods of designing
> computer programs for accounting and management information systems,
> techniques and formulas such a[s] methods of cost unit measurement; salary,
> bonus and compensation policies and amounts, employment history and
> related information regarding company employees; and other data,
> information and knowledge of whatever nature or form which at the time or
> times concerned is not generally made available by Carlson to anyone, except
> in an employment or other business relationship with Carlson.

(*Id.*)  The Employee Defendants agreed to hold such information "in a fiduciary capacity

and in strictest confidence" and to never reveal that information "to any other person, firm,

corporation, other entity or organization" without permission.  (*Id.*)  Finally, they agreed

to return all such confidential material upon termination of employment.  (*Id.* ¶ 3.)

In January 2008, Carlson Companies sold its equity interest in Carlson Travel Group

to Travel Acquisition Group (TAG).  (Compl. ¶ 57; Baumann Decl. ¶ 5.)  In 2009, TAG

changed its name to Travel Leaders Group (TLG).  (Compl. ¶ 57; Baumann Decl. ¶ 5.)

Baumann remained President of CS throughout the company's changes in ownership.

(Compl. ¶ 57; Baumann Decl. ¶ 5.)  Eventually, Baumann became President of Plaintiff

TLLG, a subsidiary of TLG, which continued to do business as CS.  (Compl. ¶ 57;

Baumann Decl. ¶ 5.)

### 3. Baumann Leaves Cruise Specialists and Enters Into A Settlement Agreement with TLG

On July 12, 2013, Baumann resigned as President of TLLG (and accordingly, CS). (Compl. ¶ 58.) In connection with his resignation, a dispute arose between TLG and Baumann over whether his termination was with or without cause. (Baumann Decl. ¶ 8.) To resolve that dispute, TLG and Baumann entered into a Settlement Agreement dated September 24, 2013 ("Settlement"). (*See* Compl. Ex. J.) In relevant part, the Settlement noted that Baumann's last day of employment with TLG was June 27, 2013, and contained a broad "Release of Claims" provision releasing each party from "any and all claims that each party has or may have against the other as a result of TLG's hiring of [Baumann], [Baumann's] employment with the TLG, the cessation of [Baumann's] employment with the TLG, [Baumann's] status as a shareholder of TLG, or any other conduct of either party up to the date of [the Settlement.]" (*Id.* ¶ 5.) The Settlement is governed by Minnesota law, and lists TLG's point of contact as its Senior Vice President and General Counsel in Plymouth, Minnesota, and Baumann's point of contact as his home in Florida. (*Id.* ¶¶ 12, 15.)

The Settlement contains three other provisions relevant here: a Non-Solicitation covenant, a Non-Competition covenant, and a Confidentiality agreement. (*Id.* ¶¶ 8–9.) Under the Non-Solicitation covenant, Baumann agreed that for two years—beginning on June 27, 2013—he would "not directly or indirectly, on his behalf or on behalf of any other person, firm, partnership, corporation or other entity . . . solicit or service the business of," in such a manner "as to reduce, diminish, negatively affect or impair the business of TLG":

(1) "any of TLG's or its Affiliates' clients which are known by [Baumann] to be clients prior to [his] actions that are claimed to breach this limitation";

(2) "any of TLG's or its Affiliates' former clients which were clients within [12] months prior to June 27, 2013 and which are known by [Baumann] to be former clients prior to [his] actions that are claimed to breach this limitation"; or

(3) "any prospective clients which were being actively solicited by the TLG or its Affiliates as of June 27, 2013 and which are known by [Baumann] to be prospective clients prior to [his] actions that are claimed to breach this limitation[.]"

(*Id.* ¶ 8(a).)  He also agreed—again, for two years beginning June 27, 2013—not to "attempt to cause or induce any employee of TLG or its Affiliates to leave TLG or the Affiliate." (*Id.*; *see also* Compl. ¶¶ 61–62.)

Under the Non-Competition covenant, Baumann agreed that for one year beginning on June 27, 2013, he would not "engage, without the consent of the TLG, in any business or activity, whether as an employee, consultant, partner, principal, agent, representative, stockholder or in any other capacity, or render any services or provide any advice to any business, activity, person or entity which competes with any leisure, corporate, franchise or cruise travel management companies" either in the United States or anywhere outside the United States where TLLG had conducted business in the two years prior to June 27, 2013.  (Compl. Ex. J ¶ 8(b); Compl. ¶ 63.)

Finally, under the Confidentiality agreement, Baumann agreed not to directly or indirectly "divulge, disclose or make available or accessible any Confidential Information . . . to any person, firm, partnership, corporation, trust or any other entity or third party . . . ." (Compl. Ex. J ¶ 9.)  The term "Confidential Information" was defined as:

> [A]ll information respecting the business and activities of TLG, or any
> Affiliate of TLG, including, without limitation, the terms and provisions of
> [the Settlement], the clients, customers, suppliers, employees, consultants,
> computer or other files, projects, products, computer disks, or other media,
> computer hardware or computer software programs, marketing plans,
> financial information, methodologies, know-how, processes, practices,
> approaches, projections, forecasts, formats, systems, data gathering methods,
> and/or strategies of TLG or any Affiliate.

(*Id.*; Compl. ¶ 60.)  The Settlement also contained a provision requiring Baumann to return

any TLG information of any kind in his possession or control back to TLG.  (Compl. Ex.

J. ¶ 4(b).)

### 4. Baumann Starts Cruise & Travel Experts and Allegedly Violates the Settlement

In September of 2014, Baumann launched CTE and allegedly began soliciting the

Employee Defendants in violation of the two-year prohibition contained in his Settlement

with TLG.  (Compl. ¶ 65.)  For example, Plaintiff contends that Baumann contacted Cox

before June 27, 2015 and induced her to leave CS to work for CTE; Cox left CS on July

15, 2015.  (*Id.* ¶ 67.)  Similarly, Childs resigned from CS on March 11, 2016, Dickerson

on February 10, 2017, Boots on January 22, 2018, and Ellsworth on February 5, 2018.  (*Id.*

¶¶ 68–71.)  All the Employee Defendants currently work for CTE in the same role—cruise

consultants—that they held at CS.  (*Id.* ¶ 66.)

Plaintiff also contends that CTE and the Employee Defendants began soliciting CS

clients to switch their business from CS to CTE.  (*Id.* ¶ 72.)  Specifically, Plaintiff claims

that Dickerson successfully solicited two former CS clients in July 2017.  (*Id.* ¶ 72.)

Ellsworth and Boots have also allegedly transferred several former CS clients to CTE.  (*Id.*

¶ 74.)  Since 2015, at least 56 high-net-worth CS clients have transferred their business to CTE.  (*Id.* ¶¶ 75–76.)

Over time, CS became aware that its clients were transferring their business to CTE, and working with the same cruise consultant that they had worked with at CS.  (*Id.* ¶ 77.)  It conducted a computer forensic investigation and discovered that between June 5 and June 25, 2013—the month prior to his resignation—Baumann had allegedly misappropriated the data underlying the CLC Database by forwarding it to his personal email address prior to leaving the company.  (*Id.* ¶¶ 78–79.)  The data Baumann took included a contact list for CS's management team; a job description for CS's operations manager position; CS profit and loss statements; spreadsheets with customer reservation numbers, sail dates, and other information; a CS client list; a CS monthly activity report and 52-week sales planner; a PowerPoint presentation discussing CS's financial performance; and summaries of CS's financial performance from 2009 to 2012.  (*Id.* ¶ 78.)  CS also claims Baumann downloaded and misappropriated at least five detailed customer-relationship-management reports with full client details for CS high-net-worth clients.  (*Id.* ¶ 80.)  CS asserts that Baumann then distributed the data he misappropriated to Employee Defendants and CTE for their use to solicit CS clients.  (*Id.* ¶ 81.)  For his part, Baumann admits he emailed the information described by Plaintiff to himself, but asserts that he either returned or destroyed all of it.  (Baumann Decl. ¶ 16.)

### C.    Procedural History

On November 11, 2019, CS filed suit against Defendants, asserting nine different causes of action.  (*See* Compl.)  CS's claims can generally be divided into three categories:

(1) breach of contract or confidentiality claims; (2) tortious interference or unfair competition claims; and (3) misappropriation of trade secrets claims.

Within the first category, in Count One—brought against the Employee Defendants—CS claims that each Employee Defendant breached his or her Employment Contracts by soliciting CS clients using CS confidential, proprietary trade secrets. (*Id.* ¶¶ 83–87.) Similarly, in Count Two—brought against Baumann—CS claims that Baumann breached the Settlement Agreement between himself and TLG by misappropriating CS trade secrets and using them to solicit CS cruise consultants and CS clients for CTE. (*Id.* ¶¶ 89–93.) And in Count Seven—brought against all Defendants— CS claims that Defendants breached a duty of confidentiality owed to CS. (*Id.* ¶¶ 130– 132.)

Within the second category, in Count Three—brought against Baumann and CTE— CS claims that Baumann and CTE tortiously interfered with the Employee Defendants' Employment Contracts and intentionally and unjustifiably caused each Employee Defendant to breach those contracts. (*Id.* ¶¶ 95–99.) Similarly, in Count Four—brought against all Defendants—CS claims that Defendants tortiously interfered with CS's prospective economic advantage by misappropriating CS's trade secrets in order to solicit CS clients and unfairly compete against CS within the luxury cruise travel agency field. (*Id.* ¶¶ 101–106.) In Count Eight—brought against all Defendants—CS alleges that Defendants engaged in unfair competition by using CS confidential information to solicit CS's long term high-net-worth clients, which gave CTE an unfair advantage over CS and causing harm. (*Id.* ¶¶ 134–140.) And in Count Nine—also against all Defendants—CS

asserts that Defendants have been unjustly enriched through their actions.  (*Id.* ¶¶ 141–142.)

Finally, in the third category, in Count Five—brought against all Defendants—CS claims that Defendants had access to CS's CLC Database, and the confidential secrets therein, and misappropriated those secrets in order to benefit CTE and harm CS in violation of Minn. Stat. § 325C (2018).  (*Id.* ¶¶ 108–121.)  In the same vein, in Count Six—also brought against all Defendants—CS alleges misappropriation of trade secrets, but in violation of 18 U.S.C. § 1836 (2018).  (*Id.* ¶¶ 123–128.)

On December 12, 2019, Defendants brought the present motion to dismiss, asserting that this Court lacks personal jurisdiction over each Defendant because each Defendant lacks the required contacts with Minnesota.  (*See* Defs.' Mot. to Dismiss [Doc. No. 24].)

## II.   DISCUSSION

### A.   Legal Standard for Specific Personal Jurisdiction

Defendants contend that the Court lacks both general and specific personal jurisdiction over each Defendant.  (*See* Defs.' Mem. In Supp. of Mot. to Dismiss ("Defs.' Mem.") [Doc. No. 36] at 18–31.)  In response, CS asserts that the Court has specific personal jurisdiction[2] over each Defendant based on their contacts with—or, for its tort-based claims, based on the tortious harm directed by Defendants at—Minnesota.  (*See* Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Pl.'s Opp'n Mem.") [Doc. No. 37] at 10.)

---

[2]   CS does not assert that this Court has general personal jurisdiction over Defendants. (Pl.'s Opp'n Mem. at 11.)

In order to survive a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), a " 'plaintiff must make a prima facie showing that personal jurisdiction exists.' " *Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 875 (D. Minn. 2019) (quoting *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011)). This showing requires that the Plaintiff "plead 'sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state.' " *Id.* (citation omitted). The evidence "must be tested by affidavits and exhibits supporting or opposing the motion, and not by the pleadings alone[,]" but in any event, the showing required of the Plaintiff is "minimal[.]" *Id.* at 875–876 (citation omitted). When deciding whether Plaintiff has made the necessary prima facie showing, the Court views "the evidence in the light most favorable to the plaintiff and resolves all factual conflicts in the plaintiff's favor." *Id.* at 876 (citing *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996)).

A federal court sitting in Minnesota may only exercise personal jurisdiction over nonresident defendants to the extent provided under Minnesota law, but because Minnesota's long-arm statute extends jurisdiction to the maximum limit permitted by due process, federal courts in Minnesota need only determine whether their exercise of personal jurisdiction comports with due process. *Id.* at 876 (citations omitted). "Due process requires a non-resident defendant to have sufficient minimum contacts with the forum state such that the maintenance of the lawsuit does not offend 'traditional notions of fair play and substantial justice.' " *Id.* at 876 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980)). Generally, minimum contacts are present when the

Defendant has engaged in an act through which the Defendant purposely avails itself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's law. *Id.* (citation omitted). Moreover, the nature of the contacts with the forum state "must be 'such that [the defendant] should reasonably anticipate being haled into court there.' " *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

When evaluating the sufficiency of a defendant's contacts with a forum state, the Eighth Circuit has directed courts to consider five factors: "(1) the nature and quality of contacts, (2) the quantity of contacts, (3) the relation of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience of the parties." *Id.* (citing *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.3d 1338, 1340 (8th Cir. 1983)). The first three factors of the test are "primary" in terms of importance, while the last two are of "secondary" importance. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010).

In addition to these factors, "[a] defendant's tortious conduct can [also] be a basis for personal jurisdiction." *Paisley Park Enters.*, 361 F. Supp. 3d at 878 (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)). The *Calder* "effects test," as it has become known, may be considered where a defendant is claimed to have committed an intentional tort. *Id.* To establish personal jurisdiction under the "effects test" set forth in *Calder*, "a plaintiff must make a prima facie showing that 'the defendant's acts (1) were intentional, (2) were 'uniquely' or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum].' " *Id.* (quoting *Zumbro, Inc. v. Cal. Nat. Prods.*, 861 F. Supp. 773, 782–83 (D. Minn. 1994)).

16

Importantly, however, the *Calder* "effects test" is not sufficient on its own to establish specific personal jurisdiction. Instead, the Eighth Circuit considers it in conjunction with its normal five-factor analysis used to evaluate specific personal jurisdiction. *See Johnson*, 614 F.3d at 797 (noting that "the *Calder* test [is] merely as an additional factor to consider when evaluating a defendant's relevant contacts with a forum state" and reaffirming prior case "declin[ing] to grant personal jurisdiction solely on the basis of forum state effects from an intentional tort" (citation omitted)).

Plaintiff has alleged that in addition to breaching various agreements or duties, all Defendants have committed the intentional tort of tortious interference with prospective economic advantage. (*See* Compl. ¶¶ 101–106 (Count Four).) Accordingly, the Court considers the five-factor "minimum contacts" test, as well as the *Calder* "effects test" where relevant, to determine whether Defendants' contacts with Minnesota are sufficient to establish a prima facie case of specific personal jurisdiction. *See Regenexx, LLC v. Regenex Health LLC*, ___ F. Supp. 3d ___, 2020 WL 1269790, at *5 (S.D. Iowa Mar. 17, 2020) ("Ultimately, a court 'must look at all of the factors in the aggregate and examine the totality of the circumstances in making a personal-jurisdiction determination.' " (quoting *Johnson*, 614 F.3d at 794)). The Court's analysis must be both defendant-specific and claim-specific. *See NexGen HBM, Inc. v. ListReports, Inc.*, No. 16-cv-3143 (SRN/FLN), 2017 WL 4040808, at *10 (D. Minn. Sept. 12, 2017) (noting that "the analysis must be specific to each defendant." (citations omitted)); *Zumbro, Inc.*, 861 F. Supp. at 779

(noting that "it is necessary to address each of [Plaintiffs'] claims individually." (citation omitted)).[3]

## B.   Analysis

### 1.   Baumann

The Court first addresses whether it has specific personal jurisdiction over Baumann.  The claims asserted against him include breach of contract (Count One), tortious interference with contract (Count Three), tortious interference with prospective economic advantage (Count Four), misappropriation of trade secrets (Counts Five and Six), breach of confidentiality (Count Seven), unfair competition (Count Eight), and unjust enrichment (Count Nine).

CS contends that Baumann has sufficient claim-specific contacts with Minnesota because he was employed for years by CS, a Minnesota company, and all of Baumann's essential job functions were carried out in Minnesota.  (Pl.'s Opp'n Mem. at 18 (asserting Baumann has the same contacts as the Employee Defendants).)  To that end, CS argues that Baumann's connections to Minnesota include (1) his employment by a Minnesota company; (2) his use of hardware and software issued from CS's Minnesota office; (3) receiving pay from CS's Minnesota office; (3) misappropriating trade secrets from their storage location in CS's Minnesota office; and (4) signing (and ultimately breaching) a

---

[3]   The Court does note, however, that Plaintiffs' contractual and tort claims all stem from similar—although not the same—conduct, which mitigates the need for claim-specific analysis.  *See Neopart Transit, LLC v. Mgmt. Consulting, Inc.*, No. 16-3103, 2017 WL 714043, at *4 (E.D. Pa. Feb. 23, 2017) (noting that because plaintiff's "statutory, contract and tort claims all stem from the same conduct, the alleged misappropriation of confidential information and trade secrets, a claim-specific analysis is not necessary.")

Settlement Agreement with CS governed by Minnesota law.  (*Id.* at 13–16 (summarizing contacts of individual defendants), 18 (asserting Baumann has the same contacts).) Moreover, Plaintiff notes that while Baumann was employed at CS, he reported to Minnesota-based supervisors, and occasionally traveled to Minnesota to use an office that was provided to him, despite working primarily from his home in Michigan.  (*Id.* at 18– 19; *see also* Baumann Decl. ¶ 2.)  Beyond those contacts, Plaintiff argues, Baumann's status as a former CS corporate officer "strengthens his ties" to Minnesota because Baumann cannot accept the " 'mantle of corporate officership' " for a Minnesota-based business while simultaneously renouncing any meaningful contacts with Minnesota.  (*Id.* at 20 (quoting *Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 358 (E.D. Pa. 2016).)  Finally, Plaintiff contends that Baumann's alleged misappropriation of trade secrets also satisfies the *Calder* "effects test" because, by intentionally taking trade secrets from CS's Minnesota office, he directed his harm at Minnesota.  (*Id.* at 22.)

Baumann asserts that he lacks sufficient—much less claim-specific—contacts with Minnesota.  (Defs.' Mem. at 25–27.)  He argues that he has never lived in Minnesota, and only occasionally visited his Minnesota office prior to the time TLLG acquired CS.  (*Id.* at 25.)  Baumann also claims that the contacts CS relies on are "temporally infirm" because the Settlement he signed with CS settled any and all claims between CS and Baumann, apparently meaning CS's claims must have necessarily arisen after the Settlement.  (*Id.* at 26.)  Accordingly, Defendants argue, CS's reliance on Baumann's pre-Settlement contacts with Minnesota is improper because those contacts could not be claim-specific.  (*Id.*)  With respect to the Settlement itself, Baumann contends it was not signed or negotiated in

Minnesota, does not contemplate any performance or conduct in Minnesota, and that CS fails to allege any breach in Minnesota or that was aimed at Minnesota. (*Id.* at 26–27.) Finally, Baumann asserts that the *Calder* "effects test" is also not satisfied because, at most, he disclosed some confidential information that supposedly originated in Minnesota. (*Id.* at 27.) Baumann claims that the confidential information at issue originated in Washington, and that any misappropriation of that information—which he denies—at most harmed a Minnesota business, as opposed to specifically targeting the forum itself. (*Id.*)

Viewing the facts of this limited record in a light most favorable to the Plaintiff, *see K-V Pharm. Co.*, 648 F.3d at 591–92, the Court finds that CS has made a prima facie case of specific personal jurisdiction over Baumann for each claim brought against him. The Court considers Plaintiff's non-tort claims first, followed by Plaintiff's tort-based claims under the *Calder* "effects test."

### a. Nature, Quality, and Quantity of Contacts, and Relation of Contacts to Plaintiff's Claims

The Court first considers the nature, quality, and quantity of Baumann's contacts with Minnesota (i.e., the first three factors of the Eighth Circuit's test). *See Paisely Park Enters., Inc.*, 361 F. Supp. 3d at 876–77. In doing so, the Court considers "how purposeful the defendant's contact" is with Minnesota. *Id.* While "random, fortuitous, and attenuated" contacts do not confer personal jurisdiction, even a single contact of the right nature and of sufficient quality can be enough. *Id.* (citing *Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1020 (D. Minn. 2008)). Moreover, with respect to quantity, "a low volume of contacts will not defeat an otherwise meaningful interaction with the forum state, nor will a high volume

of contacts bolster an otherwise deficient connection to the forum state." *Id.* at 877. To that end, "a single, direct" contact "may be sufficient to confer personal jurisdiction," while in other circumstances, "even 100 phone calls will not . . . ." *Id.* (citations omitted).

Here, the Court finds that Baumann has substantial contacts with Minnesota which, considered in their totality and based on the claims against him, subject him to suit in Minnesota. The holding in *Custom Conveyor Corp. v. Hyde*, is particularly instructive here. 237 F. Supp.3d 895 (D. Minn. 2017). In *Hyde*, the court addressed whether it could exercise specific personal jurisdiction over a remote sales employee who worked for a Minnesota company for five years based out of his home in Georgia. *Id.* at 897. During his time with the Minnesota company, that employee traveled to Minnesota, engaged in near constant communication with Minnesota-based employees, and acquired significant knowledge of the Minnesota company's proprietary information. *Id.* Upon leaving the company, the employee allegedly copied the Minnesota company's proprietary information and later disclosed it to a competitor. *Id.* The court ultimately held that the defendant was subject to personal jurisdiction in Minnesota based on his contacts with the state, noting that travel to Minnesota, extensive "daily" communication with Minnesota-based employees, multiple years of employment by and payment from a Minnesota company, and alleged misappropriation of trade secrets stored in Minnesota from a Minnesota company were sufficient minimum contacts to established specific personal jurisdiction. *Id.* at 900–901.

*Hyde* is on point here. For years, Baumann worked remotely as the President—not just as an employee—of the Minnesota-based CS from Michigan and communicated

21

almost daily with Minnesota-based employees.  (*See* Compl. ¶¶ 11, 12; Baumann Decl. ¶ 2.); *see also Hyde*, 237 F. Supp. 3d at 900–901.  Additionally, Baumann traveled to and utilized a Minnesota-based office on several occasions in connection with his employment with CS.  (Baumann Decl. ¶ 2); *Hyde*, 237 F. Supp. 3d at 900–901.  During that time, Plaintiff alleges, Baumann had access to and learned about CS's proprietary information, so much so that he was the very person who initiated and implemented the policy of having CS's cruise consultants sign Non-Compete/Non-Disclosure and Conditions of Employment Agreements.  (Compl. ¶¶ 42–44.)  Moreover, Baumann admits to having emailed to himself CS's proprietary information (*see* Baumann Decl. ¶ 16) that Plaintiff alleges he then shared with CTE (a competitor) and the Employee Defendants (the competitor's employees).  (Compl. ¶¶ 11–12.)  As the Court stated in *Hyde*, "an employee undertaking such conduct should not be surprised that he might be sued in, and subject to the jurisdiction of, the state in which his former employer is located.  Indeed, courts have routinely reached that same conclusion."  237 F. Supp. 3d. at 901 (collecting cases) (citations omitted).[4]

---

[4]   Defendants argue that the Court should not consider Baumann's contacts with Minnesota that predate the Settlement, citing the Court's prior decision in *McGill v. Conwed Corp.*, No. 17-cv-01047 (SRN/HB), 2017 WL 4534827, at *9 (D. Minn. Oct. 10, 2017).  However, *McGill* is readily distinguishable.  In *McGill*, plaintiffs attempted to rely on 30-year-old contacts with Minnesota unrelated to their claims against the defendant, *see* 2017 WL 4534827, at *10.  Here, Baumann's contacts with Minnesota arose as a direct result of his employment with and alleged misappropriation of trade secrets from a Minnesota-based company, and the resulting impact his misconduct has allegedly caused in Minnesota.

Moreover, Baumann had other contacts with Minnesota further supporting this Court's exercise of personal jurisdiction over him.  Baumann understood that "all the essential functions that allowed [him] to earn a living," such as the company's human resources and payroll,[5] "were channeled through [Minnesota]," which further connects him to this forum.  *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2017 WL 4340123, at *4 (N.D. Ill. Sept. 29, 2017) (finding sufficient minimum contacts over remote employee); *see also McCabe*, 161 F. Supp. 3d at 355 (finding personal jurisdiction over remote employee where payroll processing, benefits, and electronic network used by employee were all managed by forum office, and noting that "all of [those] links with [the forum] are characteristic of a traditional employer-employee relationship, except for location, underscoring that Defendants' connection to the [forum] is more than incidental").  Baumann also entered into at least one agreement with CS—the Settlement— which contains a Minnesota choice-of-law provision and indicates that CS's place of business for purposes of notice regarding the Settlement was Minnesota.  *See ProMove, Inc. v. Siepman*, 355 F. Supp. 3d 816, 822 (D. Minn. 2019) (noting additional factor supporting minimum contacts by remote employee was, among things, entering into agreements with a Minnesota company); *see also Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1434 (8th Cir. 1995) (noting that "a choice-of-law clause is an important factor in determining whether the defendant purposefully availed [himself]

---

[5]     The Court notes that the parties dispute where CS's company operations originate. On this motion to dismiss, however, the Court construes the facts in favor of Plaintiff, the non-moving party.  *See K-V Pharm. Co.*, 648 F.3d at 591–92.

in the forum state" but acknowledging it is "insufficient standing alone to confer jurisdiction").[6]   Ultimately, "[s]tanding alone, each of these contacts and considerations would [likely] be insufficient to confer personal jurisdiction[,]" but "together, they are enough."   *Patrick's Rest., LLC v. Singh*, No. 18-cv-00764 (ECT/KMM), 2019 WL 2869082, at *8 (D. Minn. July 3, 2019) (citation omitted).

The Court also finds that Plaintiff's non-tort claims against Baumann are sufficiently connected to Baumann's contacts with Minnesota.   To meet the nexus requirement of specific personal jurisdiction, the claims at issue must *either* arise out of *or* relate to the nonresident defendant's activity in the forum.   *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 746 (8th Cir. 2011) (observing disjunctive nature of relatedness test). Plaintiff's breach of contract (Count Two) and breach of confidentiality (Count Seven) claims against Baumann are related to Baumann's contacts with Minnesota because they are based on Baumann's contact with Minnesota through his Settlement Agreement—an

---

[6]   Plaintiff contends that Baumann's status as the former President of CS renders him uniquely subject to suit here, citing *McCabe*, 161 F. Supp. 3d at 358 in support. (*See* Pl.'s Opp'n Mem. at 20.)   In *McCabe*, the court found that a former corporate officer was subject to suit in Pennsylvania because her *status* as a former officer "inextricably bound [her] to Pennsylvania" and that "[b]y accepting the responsibility of corporate officership, [she] distinguished herself from regular employees and aimed her actions into her company's home state in a way that regular employees did not."   161 F. Supp. 3d at 358.   That discussion occurred, however, in the context of a claim for breach of *fiduciary duty* which, the court noted, uniquely causes harm to the corporation in its principal place of business. *Id.*   Here, no such claim has been made, and in any event, the Eighth Circuit has previously expressed doubt about such status-based assertions of personal jurisdiction.   *See Ark. Rice Growers Co-op. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565, 573–74 (8th Cir. 1986) (rejecting assertion that personal jurisdiction could arise from mere status as shareholder in a corporation).

employment-related agreement between Baumann and a Minnesota-based company, with a Minnesota choice-of-law provision—which Plaintiff contends barred Baumann from disclosing or sharing any of CS's confidential or trade secret information, and from soliciting CS clients or employees for a specified period.  (Compl. ¶¶ 90–91, 129–132.)  Baumann allegedly breached those provisions by impermissibly copying and disseminating CS's Minnesota-based trade secrets—secrets he acquired while working for CS—from Minnesota-based servers, confirming that each claim is related to Baumann's unique contacts with Minnesota.  (Scrivanich Decl. ¶¶ 10, 15); *see also Neopart Transit, LLC*, 2017 WL 714043, at * 7 (noting that "an action against a nonresident employee for a breach of an employment-related agreement with a  [Minnesota] company 'certainly arise[s] out of and relate[s] to [the employee's] contacts with [Minnesota]' " (citation omitted)).

Plaintiff's misappropriation of trade secrets claims (Counts Five and Six), unfair competition claim (Count Eight) and unjust enrichment claim (Count Nine) also sufficiently relate to Baumann's contacts with this forum.   Baumann purportedly misappropriated trade secrets that he acquired while working for a Minnesota-based company, which were stored on Minnesota servers.  (Compl. ¶¶ 12, 115–116, 123–124); *see Hyde*, 237 F. Supp. 3d at 901 (finding nexus requirement satisfied because "the allegedly misappropriated information was provided from a Minnesota company, and hence there existed a substantial nexus between [the remote employee's] Minnesota contacts and [Plaintiff's] claims").   And Plaintiff's unfair competition and unjust enrichment claims all stem from that same misappropriation, dissemination, and resultant

impact on CS's business.   (Compl. ¶¶ 134–137, 141–142).   Accordingly, the non-tort claims asserted against Baumann are sufficiently related to Baumann's contacts with Minnesota.

### b.   *Calder* "Effects Test"

Further supporting this Court's exercise of personal jurisdiction over Baumann is the application of the *Calder* "effects test" for intentional torts, under which "a plaintiff must make a prima facie showing that 'the defendant's acts (1) were intentional, (2) were 'uniquely' or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—there.' " *Paisley Park Enters.*, 361 F. Supp. 3d at 878 (quoting *Zumbro, Inc.*, 861 F. Supp. at 782–83). Notably, on a motion to dismiss, the test largely comes down to the second and third factors because "[a]t this juncture" the Court "must accept as true [Plaintiff's] claim that [Baumann's] acts were intentional." *FCStone LLC v. Buckley*, 864 F. Supp. 2d 816, 823 (S.D. Iowa 2012) (applying *Calder* "effects test").

Here, because Baumann was the former President of CS and, according to CS's allegations, was well aware that harm in the form of a loss of employees and clients would be felt by CS in Minnesota (*see* Compl. ¶ 12), the question before the Court is whether Baumann expressly targeted his actions at the forum state. *Paisley Park Enters.*, 361 F. Supp. 3d at 879 (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991)); *see also Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020) (citation omitted) (same).  This inquiry requires the Court to consider whether Baumann intentionally acted so as to foreseeably cause harm in Minnesota.  *Paisley Park Enters.*,

361 F. Supp. 3d at 879 (citation omitted).  Baumann's mere knowledge that CS would be harmed in Minnesota would be insufficient.  *See Truitt v. Westlake Hardware, Inc.*, No. 2:14CV65 HEA, 2015 WL 2453010, at *9 (E.D. Mo. May 22, 2015) (quoting *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1387 (8th Cir. 1993)) (collecting cases).

The Court finds that CS has adequately pleaded that Baumann's allegedly tortious interference with Employee Defendants' contracts and tortious interference with CS's prospective economic advantage (Counts Three and Four) were uniquely directed at Minnesota.  Plaintiff alleges that Baumann (1) knew of and about the Employment Contracts that existed between the Employee Defendants and CS because he was the person who insisted they be created in the first place; and (2) intentionally caused each Employee Defendant to breach those contracts with CS while inducing them to leave the Minnesota company and join his new competing business, CTE.  (Compl. ¶¶ 95–96.)  CS adequately alleges that Baumann uniquely directed his allegedly tortious conduct at severing Minnesota-based connections between Plaintiff and Employee Defendants.  Indeed, Minnesota is the only place where such harm could have been felt.  *Strategic Prods. & Servs., LLC v. Integrated Media Techs., Inc.*, No, 18-00694 (KSH) (CLW), 2019 WL 2067551, at *7 (D. N.J. May 10, 2019) (finding tortious interference with contract expressly aimed at New Jersey where interference was between the plaintiff and employees who reported to New Jersey headquarters, received payroll and benefits from New Jersey, were subject to confidentiality agreements that survived the termination of their employment, and where the interference was orchestrated by an individual who knew of the contracts at issue and was himself subject to restrictive covenants); *cf. MaxLite, Inc. v.*

27

*ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 390 (D. N.J. 2016) (finding defendant aimed tortious interference with remote employees' contracts at plaintiff's home state where, among other things, defendant knew the details of the employees' contracts and competed with plaintiff in that state).

With respect to Plaintiff's claim of tortious interference with prospective economic advantage, Plaintiff contends that Baumann intentionally interfered with CS's reasonable expectation of economic benefit stemming from its CLC Database and its customers by impermissibly using CS's proprietary and trade secret information to transfer CS clients to CTE and give CTE a competitive advantage. (*Id.* ¶¶ 101–105.) Importantly, Plaintiff contends that each Employee Defendant served Minnesota clients. (Scrivanich Decl. ¶ 19.) Baumann's allegedly tortious interference with (1) CS's prospective economic advantage stemming from its Minnesota-based proprietary information; and (2) at least some Minnesota-based clients, further establishes Minnesota as the "focal point" of Baumann's purportedly tortious conduct. *See Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 634 (E.D. Pa. 2015) (finding non-Pennsylvania defendants " 'expressly aimed' their allegedly tortious conduct at [Pennsylvania] by taking steps to interfere with the prospective and existing business relationships of a Pennsylvania-based business" (citation omitted)); *see also MaxLite, Inc.*, 193 F. Supp. 3d at 390 ("Critically, [the defendant] used the Employee Defendants in an effort to increase its sales in [the forum state], allegedly utilizing [Plaintiff's] confidential information in the process.") Indeed, "[i]n the trade secrets misappropriation context" in particular, as is the case here, "it makes sense that the focal point of the [defendant's] effects is more likely to be the [plaintiff] corporation's

headquarters . . . [i.e.,] where it keeps those secrets . . . ." *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, No. 2:15-cv-00965, 2020 WL 1526940, at *13 (W.D. Pa. Mar. 31, 2020) (citations omitted). Accordingly, the Court finds that, in addition to making out a prima facie case under the five factor test, Plaintiff has also made out a prima facie case under the *Calder* "effects test" that Baumann "expressly targeted Minnesota or affirmatively calculated that [his] conduct would be primarily felt here[,]" *NexGen HBM, Inc.*, 2017 WL 4040808, at *13.

### c.      Minnesota's Interest & Convenience of the Parties

Having found that Baumann has sufficient claim-specific minimum contacts with Minnesota to exercise personal jurisdiction over him—and that he has uniquely directed his conduct at the forum—" 'the court must . . . ask whether the exercise of personal jurisdiction over [Baumann] would nevertheless be so unreasonable as to violate the Due Process Clause.' " *Patrick's Rest., LLC*, 2019 WL 2869082, at *9 (quoting *Pope*, 588 F. Supp. 2d at 1016). This is where the fourth and fifth factors—Minnesota's interest in providing a forum and the convenience of the parties—"come into play." *Id.*

The Court finds that the fourth and fifth factors support the Court's ruling that exercising specific personal jurisdiction over Baumann is proper. Minnesota undoubtably has " 'an obvious interest in providing a local forum in which its residents[,]' " such as Plaintiff, " 'may litigate claims.' " *StoreWorks Techs., Ltd. v. Aurus, Inc.*, No. 19-cv-1527 (SRN/HB), 2020 WL 336025, at *10 (quoting *Creative Calling Solutions, Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 982 (8th Cir. 2015)). Moreover, Defendants do not assert that Baumann himself would be inconvenienced by litigating here. At most, Defendants contend that the

Employee Defendants live out of state, as does at least one witness who will likely testify about Employee Defendants' contracts.  (*See* Defs.' Mem. at 24.)  But Defendants "do[] not contend that witnesses or documents may be unavailable based on the selection of this forum" and accordingly any possible inconvenience stemming from those witnesses availability in this forum does not outweigh Minnesota's interest in providing a forum for its residents.  As such, under these circumstances, "the exercise of personal jurisdiction [over Baumann] would not offend traditional notions of fair play and substantial justice." *Creative Calling Solutions, Inc.*, 799 F.3d at 982.

### 2.    Cruise & Travel Experts, Inc.

The Court now turns to whether it has specific personal jurisdiction over CTE for the claims brought by Plaintiff.  Those claims include tortious interference with contract (Count Three), tortious interference with prospective economic advantage (Count Four), misappropriation of trade secrets (Counts Five and Six), breach of confidentiality (Count Seven), unfair competition (Count Eight), and unjust enrichment (Count Nine).  Plaintiff argues that jurisdiction over CTE is proper for these claims because (1) the Court has jurisdiction over Baumann for each of those claims, *see supra* § II(B)(1); and (2) Baumann's contacts with Minnesota are attributable to CTE because Baumann is CTE's agent for the purposes of specific personal jurisdiction.  (Pl.'s Opp'n Mem. at 24.) Specifically, Plaintiff asserts that Baumann impermissibly solicited the Employee Defendants to work for CTE, even though he knew that they were subject to confidentiality and non-solicitation agreements with CS, and CTE followed through on Baumann's acts and hired each Employee Defendant, thereby "accepting the benefits" of Baumann's

actions.  (*Id.* at 25.)  Plaintiff also contends that CTE's Minnesota contacts—through Baumann—arise out of or are related to the claims asserted against the company, and that CTE also targeted (through Baumann) its actions at Minnesota as a forum, satisfying the *Calder* "effects test."  (*Id.* at 25–26.)

For their part, Defendants argue that CTE had no relevant Minnesota contacts, much less contacts that demonstrate that it targeted Minnesota specifically with its alleged conduct.  (Defs.' Mem. at 28–29.)  Defendants contend that CTE has not solicited any employee located in Minnesota, nor is there any evidence that CTE interfered with a Minnesota-based client.  (*Id.* at 29.)  Furthermore, Defendants argue that any alleged misappropriation of the CLC Database would have occurred, if at all, in Michigan—CTE's principal place of business and place of incorporation—not Minnesota.  (*Id.*)  Finally, with respect to Plaintiff's "agency-based" argument for personal jurisdiction, Defendants claim that Plaintiff conflates jurisdiction over CTE with liability against CTE.  (*Id.* at 30–32.)  They also note that Baumann's contacts with Minnesota predate the formation of CTE and cannot be attributed to CTE for personal jurisdiction purposes.  (*Id.* at 30–32.)

### a.    Specific Personal Jurisdiction Based On Agency

"For purposes of personal jurisdiction, the actions of an agent may be attributed to [a] principal."  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55 (1st Cir. 2002), *cert. denied* 537 U.S. 1029 (2002); *see also Daimler AG v. Bauman*, 571 U.S. 117, 759 n.13 (2014) ("Agency relationships . . . may be relevant to the existence of *specific* jurisdiction. . . . As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." (citations omitted)); *Burger King*

*Corp. v. Rudzewicz*, 471 U.S. 462, 479 n.22 (1985) (noting that commercial activities carried out on a party's behalf "may sometimes be ascribed to" an out-of-state party but declining to "resolve the permissible bounds of such attribution").

The Eighth Circuit has permitted the attribution of the contacts of an agent to a principal under Minnesota law, even where the agent's actions were purportedly unauthorized, so long as the principal ultimately "support, accepted, and followed through on the efforts initiated" by the agent. *Wessels, Arnold & Henderson*, 65 F.3d at 1433 (citing *Centennial Ins. Co. v. Zylberberg*, 422 N.W.2d 18, 21 (Minn. Ct. App. 1988)). In doing so, the Eighth Circuit acknowledged that "[a]lthough contacts for personal jurisdiction are different from a principal's liability for an agent's unauthorized conduct, the same analysis is applicable." [7] *Id.* This Court has also acknowledged this concept, observing that "the forum contacts/conduct of employees are often attributable to their employers for the purpose of establishing specific personal jurisdiction over the employer." *NexGen HMB Inc.*, 2017 WL 4040808 at *12 n.7 (citation omitted); *see also Patrick's Rest., LLC*, 2019 WL 2869082, at *8 ("Minnesota law makes clear that a litigant's agent's contacts with a forum state may be considered to determine whether there is personal jurisdiction over the

---

[7] Defendants cite *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003), for the proposition that "[w]hether [a defendant] could be held vicariously liable for [another's] conduct is irrelevant to the issue of personal jurisdiction [over that defendant]." Notably, however, *Pecoraro* did not offer any analysis on agency-principal imputation of contacts for personal jurisdiction purposes, and rejected the imputation of contacts to a defendant "based solely on . . . the activity of administrators of *related* entities acting in other capacities." *Id.* (emphasis added). Unlike here, *Pecoraro* did not involve the imputation of contacts between the owner of a corporation and a corporation itself. *Id.* (noting that plaintiff was seeking to impute the contacts of an abusive priest who worked for a ranch in Nebraska to a Nebraskan bishop, and, through the bishop, to the diocese).

litigant . . . .").  Similarly, "while it is true that in general a corporation does not exist as a legal entity until incorporated, and therefore cannot have agents before its organization . . . the pre-incorporation activities of a promoter may form the basis for corporate liability when they have been ratified by post-incorporation acts of the corporation."  *Rees v. Mosaic Techs., Inc.*, 742 F.2d 765, 768–69 (3d Cir. 1984) (citations omitted).  The "acts of ratification relate back to the time of the original activities and establish an agency relationship permitting the acts of the promoter to constitute, in effect, acts done by the corporation."  *Id.* at 769 (citation omitted).  And, based on this principle, it is "permissible to consider in the [personal] jurisdictional decision pre-incorporation acts that are subsequently ratified by the corporation."  *Id.*

### b.      Application to CTE

Viewing the facts of this limited record in a light most favorable to the Plaintiff, the Court finds that Plaintiff has made a prima facie case of specific personal jurisdiction over CTE as a result of Baumann's contacts with Minnesota for each claim against the company *except* for Plaintiff's breach of confidentiality claim (Count Seven).  Plaintiff has alleged that Baumann was CTE's agent, or at the very least that CTE supported, accepted, and followed through on Baumann's unauthorized or impermissible actions against CS, which at this stage in the proceedings the Court must accept as true. (*See* Compl. ¶ 11; Pl.'s Opp'n Mem. at 24); *see also Wessels, Arnold & Henderson*, 65 F.3d at 1433 (citing *Centennial Ins. Co.*, 422 N.W.2d at 21).  Baumann's contacts with Minnesota can, as a result, be imputed to CTE for the purposes of evaluating whether CTE is subject to personal

jurisdiction here.  *Wessels, Arnold & Henderson*, 65 F.3d at 1433; *see also Rees*, 742 F.2d at 768–69.

Defendants' argument that Baumann's Minnesota contacts predate CTE's existence is unavailing because it ignores the fact that Plaintiff's claims against CTE largely rest on Baumann's conduct that occurred *after* the company was incorporated, and accordingly imputation of contacts is justified.  With respect to tortious interference with contract and prospective economic advantage, Plaintiff alleges that CTE—through Baumann—interfered with the Employee Defendants' Employment Contracts and CS's relationship with its clients, and that Baumann did so *after* CTE was formed in September 2014.  (*See* Compl. ¶¶ 65–66, 95–99, 103–106.)

The Court has already concluded that Baumann's purportedly tortious conduct was expressly and uniquely aimed at Minnesota, *see supra* § II(B)(1)(b).  Baumann's conduct can therefore be imputed to CTE under an agency theory because CTE existed at the time Baumann's committed the allegedly tortious acts, and CTE purportedly ratified and accepted the benefits of Baumann's actions, even if they were not yet authorized.  *Wessels, Arnold & Henderson*, 65 F.3d at 1433.  The same holds true for Plaintiff's claims that CTE engaged in unfair competition and was unjustly enriched (Counts Eight and Nine).  These allegations also rest on Baumann's post-incorporation contacts with Minnesota—specifically, his solicitation of CS's cruise consultants and dissemination of CS's confidential information in order to gain an advantage over CS—and CTE's acceptance of the benefits of those actions.  (*See* Compl. ¶¶ 134–139, 142.)

34

With respect to misappropriation of trade secrets, it is alleged that Baumann copied CS's proprietary information in 2013, prior to CTE's incorporation.  (*See* Compl. ¶¶ 78–80.)  However, both Minnesota and federal law (which form the basis for each of Plaintiff's misappropriation of trade secrets claims) define "misappropriation" as, among other things, the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the discloser's or *user's knowledge of the trade secret was . . . derived from or through a person who had utilized improper means to acquire it*[.]"  Minn. Stat. § 325C.01, subd. 3(ii)(B)(I–III) (2018) (emphasis added); *see also* 18 U.S.C. § 1839(5)(B)(ii)(I–III) (2018) (same).  Accordingly, any alleged misappropriation of CS's proprietary information *by CTE* took place through Baumann *after* CTE was incorporated because CTE's act of misappropriation was the *use* of CS's purportedly confidential information despite knowing that Baumann had utilized improper means to acquire that information.  *See St. Paul Fire & Marine Ins. Co. v. FDIC*, 968 F.2d 695, 700–701 (8th Cir. 1992) (noting that under Minnesota law, both an agent and a corporate officer's knowledge may, in general, be imputed to the agent's principal, i.e., the corporation).[8]  Put another way, CTE's act of misappropriation occurred after it was incorporated, but directly stems from Baumann's

---

[8]     Even assuming the question of whether a corporate officer's knowledge can be imputed to the corporation is governed by Michigan law (CTE's place of incorporation), the result would be the same. *See Miller v. Herskovic*, No. 263250, 2006 WL 3498422, at *3 (Mich. Ct. App. Dec. 5, 2006) (noting that a president of a corporation is an "officer (and, hence, an agent) of a corporation"); *see also Morris v. Schnoor*, Nos. 315006, 315007, 315702, 315742, 2014 WL 2355705, at *38 (Mich. Ct. App. May 29, 2014) (noting that a corporation's officer's knowledge is "readily imputed to their . . . corporation[]").

pre-incorporation act of copying CS's proprietary information from Minnesota. And in any event, Baumann's pre-incorporation misappropriation can be imputed to CTE because CTE allegedly accepted its benefits. *See Rees*, 742 F.2d at 768–69.

Plaintiff's claim for breach of confidentiality against CTE (Count Seven), however, requires a different result. It is unclear on what basis Plaintiff alleges that CTE had a duty of confidentiality to CS. The entirety of the allegation in the complaint states: "Due to the above-detailed misconduct, Defendants have breached their duty of confidentiality." (Compl. ¶ 130.) Unlike the Employee Defendants and Baumann, CTE did not enter into any agreement with CS that obligated it to keep CS's proprietary information confidential, nor has Plaintiff offered any explanation as to how any aspect of Baumann's Settlement with CS, executed prior to CTE's incorporation, was adopted or ratified by CTE, or should be imputed to CTE. Thus, unlike Plaintiff's claims against CTE for tortious interference, misappropriation of trade secrets, unfair competition, and unjust enrichment—all of which rest on CTE's unique ratification and acceptance of Baumann's Minnesota-specific conduct—Plaintiff has failed to make a prima facie case that CTE's purported breach of confidentiality has any connection with Minnesota. As such, the Court cannot exercise specific personal jurisdiction over CTE with respect to Count Seven. *See Zumbro, Inc.*, 861 F. Supp. at 780 (declining to exercise specific personal jurisdiction over nonresident defendant whose contacts with Minnesota were unrelated to claims asserted by plaintiff).

The Court's ruling that it has specific personal jurisdiction over CTE for Counts Three, Four, Five, Six, Eight, and Nine—but not Count Seven—is consistent with Minnesota's interest in providing a forum and the convenience of the parties. *See Patrick's*

*Rest., LLC*, 2019 WL 2869082, at *9.  As noted above, Minnesota has " 'an obvious interest in providing a local forum in which its residents[,]' " such as Plaintiff, " 'may litigate claims.' "  *StoreWorks Techs., Ltd.*, 2020 WL 336025, at *10 (quoting *Creative Calling Solutions, Inc.*, 799 F.3d at 982).  Moreover, Defendants offer no argument that CTE would be inconvenienced by litigating here, and any assertion that important witnesses may live out of state does not outweigh Minnesota's interest in providing a forum for its residents.  As such, under these circumstances, "the exercise of personal jurisdiction [over CTE] would not offend traditional notions of fair play and substantial justice."  *Creative Calling Solutions, Inc.*, 799 F.3d at 982.

In summary, the Court finds that Plaintiff has established a prima facie case of specific personal jurisdiction over CTE with respect to Counts Three, Four, Five, Six, Eight, and Nine, but not Count Seven.

### 3.    The Employee Defendants

Finally, the Court turns to whether it has specific personal jurisdiction over the Employee Defendants for the claims brought by Plaintiff.  These claims include breach of contract (Count One), tortious interference with prospective economic advantage (Count Four), misappropriation of trade secrets (Counts Five and Six), breach of confidentiality (Count Seven), unfair competition (Count Eight), and unjust enrichment (Count Nine).  At a high level, Plaintiff contends that the Court has specific personal jurisdiction over the Employee Defendants because "their essential job functions were carried out in Minnesota, they received trade secrets from the Minnesota office, and they entered into non-solicitation and confidentiality agreements with a Minnesota company."  (Pl.'s Opp'n Mem. at 12.)

More specifically, Plaintiff asserts that (1) each employee worked for CS for more than twelve years; (2) while employed, they had continuous and regular contacts with Minnesota; (3) each employee's compensation, paychecks, bonus checks, benefits, and human resources contacts were administered from Minnesota; (4) each employee entered into a Conditions of Employment Agreement, and all but one entered into a Non-Compete/Non-Disclosure Agreement with CS; (5) each employee was issued hardware and software from Minnesota, and connected to a Minnesota-based electronic network; (6) each employee ultimately reported to a Minnesota-based supervisor; and (7) each employee was provided access to, under a duty to maintain secrecy, CS's trade secret information. (Compl. ¶¶ 13–23; Pl.'s Opp'n Mem. at 12–17.)  Plaintiff also asserts that its claims against the Employee Defendants arise out of their contacts with Minnesota because Plaintiff has alleged that they breached their Employment Contracts with CS by using confidential information provided to them in the course of their employment to benefit a competitor, CTE.  (Pl.'s Opp'n Mem. at 17.)  Finally, Plaintiff argues that because the Employee Defendants allegedly misappropriated CS's secrets—which were located in Minnesota— Minnesota has a strong connection to the claims at issue.  (*Id.* at 17–18.)

Defendants argue that the Court lacks personal jurisdiction over Employee Defendants, whether based on Employee Defendants' Employment Contracts, or their purported connections with Minnesota.  (Defs.' Mem. at 19–24.)  With respect to the Employment Contracts, Defendants note that Boots never signed a Non-Compete/Non-Disclosure Agreement with CS, and that in any event, both the Non-Compete/Non-Disclosure Agreement and Conditions of Employment Agreement were between the

Employee Defendants and *Carlson Leisure Group*, not TLG or TLLG. (*Id.* at 20.) Because any obligations under the Employment Contracts were owed only to Carlson Leisure Group or Carlson Companies, and the Agreements lack any language assigning or extending their reach to TLG, TLLG, or CS, Defendants argue that the Employment Contracts cannot constitute a Minnesota contact for Plaintiff's claims. (*Id.* at 20–21.) Defendants further argue that (1) the Employment Contracts were received, executed by, and collected from the Employee Defendants outside of Minnesota; (2) the Employment Contracts do not create any obligations or performance to be discharged in any particular state (much less Minnesota); and (3) Plaintiff fails to allege any breach of those contracts in Minnesota, or any harm directed towards the forum. (*Id.* at 21.)

With respect to Plaintiff's other claims, Defendants argue that none of the Employee Defendants knew that any of CS's confidential information was being kept in Minnesota (and dispute that fact), and point out that Plaintiff's assertion of misappropriation stems from *Baumann's* purported misappropriation and later disclosure of that information to Employee Defendants *outside* of Minnesota. (*Id.* at 22.) Additionally, Defendants argue that Plaintiff has not alleged that any Employee Defendants' purportedly tortious conduct was uniquely, much less intentionally, aimed at Minnesota. (*Id.* at 23.)

Viewing the facts of this limited record in a light most favorable to the Plaintiff, *see K-V Pharm. Co.*, 648 F.3d at 591–92, the Court finds that Plaintiff has not made a prima facie case of specific personal jurisdiction over the Employee Defendants for each claim brought against them.

### a.   Nature, Quality, and Quantity of Contacts, and Relation of Contacts to Plaintiff's Claims

The Court first compares the marked difference in the nature, quality, and quantity of Baumann's contacts with Minnesota with those of the Employee Defendants.  *See Paisely Park Enters., Inc.*, 361 F. Supp. 3d at 876–77.  As noted above, Baumann served as President of CS after it was acquired by Carlson Companies, communicated daily with Minnesota-based supervisors, and traveled to Minnesota to work out of his company-provided office within the state.  Moreover, CS has made specific allegations that Baumann copied CS's proprietary information from Minnesota-based servers and emailed that information to himself, allegedly for the benefit of his later-incorporated company, CTE.

By contrast, all but one of the Employee Defendants joined CS prior to its acquisition by any Minnesota-based company, all worked out of CS's Seattle or California offices or their own non-Minnesota homes the entire time they were employed by CS, and—with the exception of one employee event unrelated to Plaintiff's claims—none of the employees have ever been to Minnesota on any CS-related business.  (*See* Boots Decl. ¶¶ 2, 3–3.3, 14; Childs Decl. ¶¶ 2, 3.1–3.3, 13–14 (noting a one-day visit to Minnesota for "Employee Engagement Day"); Cox Decl. ¶¶ 2, 4–5, 13–14; Dickerson Decl. ¶¶ 2, 3.1, 13–14; Ellsworth Decl. ¶¶ 2, 3.1–3.2, 13–14.)  Additionally, in contrast with Plaintiff's summary allegation that each Employee Defendant reported to a Minnesota-based supervisor, each Employee Defendant has provided an affidavit[9] explaining that while

---

[9]   In considering a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the Court may consider "affidavits and exhibits presented with the motions and in opposition thereto."  *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l,*

working for CS, they reported to only non-Minnesota-based supervisors.  (Boots Decl. ¶¶ 4–6; Childs Decl. ¶¶ 4–5; Cox Decl. ¶¶ 4–6; Dickerson Decl. ¶¶ 4–6; Ellsworth Decl. ¶¶ 4–6.)  Their affidavits further state that they did not engage in any significant or ongoing contact with Minnesota while employed, and that after CS was acquired by Carlson, their job responsibilities (and chain of command for reporting to supervisors) did not change. (*See* Boots Decl. ¶ 11.1; Childs Decl. ¶¶ 11, 17–18; Cox Decl. ¶¶ 11.1–12.2, 17–18; Dickerson Decl. ¶¶ 11.1–12.2, 17–18; Ellsworth Decl. ¶¶ 11.1–12.2, 17–18.)

Even assuming the Employee Defendants' essential job functions—like payroll, human resources, and benefits—were administered from Minnesota, absent any action by the Employee Defendants to deliberately affiliate with Minnesota as a forum (like Baumann's actions), those contacts constitute only a connection between Employee Defendants and the Plaintiff—not Minnesota—and are "not enough on their own." *Pederson v. Frost*, 951 F.3d 977, 980 (8th Cir. 2020) (citations omitted).  Accordingly, unlike Baumann and the remote employee in *Hyde*, the Plaintiff has not presented a prima facie case that Employee Defendants ever traveled to or worked from Minnesota or did anything else to purposefully avail themselves of the benefits of conducting business in this state.  237 F. Supp.3d at 897–901.

Plaintiff's reliance on Employee Defendants' Employment Contracts does not change this result, particularly in light of the dearth of other Minnesota contacts.  When evaluating whether a contract can form the basis for exercising specific personal

---

*Inc.*, 702 F.3d 472, 475 (8th Cir. 2012) (citation omitted) (internal quotation marks omitted).

jurisdiction, courts typically consider whether the defendant-party to the contract " 'purposefully availed itself of the forum state' " by reviewing " 'prior negotiations between the parties, contemplated future consequences, terms of the contract, and the parties actual course of dealings.' "  *StoreWorks Techs., Ltd.*, 2020 WL 336025, at *7 (quoting *Rust Consulting, Inc. v. Schneider Wallace Cottrell Konecky Wotkyns, LLP*, No. 17-cv-4981 (DSD/FLN), 2018 WL 1247390, at *2 (D. Minn. Mar. 9, 2018)).

Here, even assuming the Employment Contracts were drafted in Minnesota, Defendants assert (and Plaintiff does not refute) that each Employee Defendant executed their respective Employment Contracts *outside* of Minnesota.  (*See* Boots Decl. ¶ 15.2 (executing Conditions of Employment Agreement in California); Childs Decl. ¶ 15.2 (executing Employment Contracts in Washington); Cox Decl. ¶ 15 (same); Dickerson Decl. ¶ (same); Ellsworth Decl. ¶ 15 (same).)  Similarly, Plaintiff has not alleged that Employee Defendants and Carlson Companies or Carlson Leisure Group (the named party in the Employment Contracts) engaged in negotiations with the Employee Defendants in Minnesota, or that they contemplated performance in this state.  The only apparent connection between the Employment Contracts and Minnesota is the presence of a Minnesota choice-of-law provision (which even then is only present in the Non-Compete/Non-Disclosure Agreement) and the fact that one party to each contract is either Carlson Companies or Carlson Leisure Group, both Minnesota entities.  (*See, e.g.*, Compl. Exs. A & B.)  And the terms of the non-compete covenant and confidentiality provisions contain no Minnesota-specific actions or limitations (*see* Compl. Exs. A &B), which "bears

out the nationwide scope of the [Employee Defendants' employment] . . . ." *Fastpath, Inc.*

*v. Arbela Techs. Corp.*, 760 F.3d 816, 822 (8th Cir. 2014).

Beyond the terms, negotiations, and contemplated future performance of the Employment Contracts, the parties' actual course of dealings relating to and following the creation of each contract further illustrates the lack of any sufficient Minnesota connection. After signing the Employment Contracts, each Employee Defendant continued to work from either a non-Minnesota-based CS office or from their non-Minnesota homes, and their work was not uniquely focused on Minnesota clients. (*See* Boots Decl. ¶¶ 3–3.3; Childs Decl. ¶¶ 3.1–3.3; Cox Decl. ¶¶ 4–5; Dickerson Decl. ¶¶ 3.1; Ellsworth Decl. ¶¶ 3.1–3.2.) Because the key inquiry as to whether an employment contract supports the exercise of specific personal jurisdiction is the expectation of some consequence or action in the forum, *see Fastpath, Inc.*, 760 F.3d at 821–22, the lack of any such expectation with regard to these Employment Contracts renders them an insufficient basis for the exercise of specific personal jurisdiction over Employee Defendants. Moreover, because the Employment Contracts formed the basis for Plaintiff's breach of contract claim (Count One) and its breach of confidentiality claim (Count Seven) against Employee Defendants (*see* Compl. ¶¶ 83–87, 130), Plaintiff has failed to allege any Minnesota contacts specific to each of those claims. *See Zumbro, Inc.*, 861 F. Supp. at 779.

Finally, Plaintiff's claim that Employee Defendants have sufficient contacts with Minnesota because they misappropriated CS's confidential information stored in Minnesota, thereby gaining an unfair advantage, and interfered with CS's prospective economic advantage, also does not support the exercise of specific personal jurisdiction.

43

Plaintiff alleges no specific act of misappropriation by Employee Defendants, and Employee Defendants themselves have submitted affidavits that they either returned or destroyed any CS work files.  (*See* Boots Decl. ¶ 18; Childs Decl. ¶ 19; Cox Decl. ¶ 19; Dickerson Decl. ¶ 19; Ellsworth Decl. ¶ 19.)

Moreover, Plaintiff's misappropriation claim against Employee Defendants appears to rest on *Baumann's act* of copying CS's CLC Database (among other pieces of information) and *his subsequent disclosure* of that information to the Employee Defendants for use at CTE.  (*See* Compl. ¶ 116.)  However, the Employee Defendants' contacts *with Baumann or CTE* do not satisfy the "defendant-focused 'minimum contacts inquiry'" because the "the relationship [with the forum state] must arise out of contacts that the 'defendant[s] [*themselves*]' create[] with the forum[,]" not their contacts with another person who had contacts with this forum.  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citing *Burger King Corp.*, 471 U.S. at 475); *see also Fastpath, Inc.*, 760 F.3d at 822–23 (noting the Supreme Court's "'consistent reject[ion]'" of "'attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State.'" (citation omitted)).  Accordingly, Plaintiff's claims for misappropriation of trade secrets against Employee Defendants—as well as its claims of unfair competition, unjust enrichment, and tortious interference with prospective economic advantage, which stem from Baumann's misappropriation—lack

claim-specific, Employee-Defendant-created contacts with Minnesota. *See NexGen HBM, Inc.*, 2017 WL 4040808, at *10.[10]

In sum, Plaintiff has failed to establish a prima facie case of specific personal jurisdiction over Employee Defendants. Moreover, because the Court has found that Plaintiff has not carried its burden with respect to the first three "primary" factors of the Eighth Circuit's minimum contacts test, it does not address Minnesota's interest or the convenience of the parties (the two "secondary" jurisdictional factors). *See Pederson*, 951 F.3d at 981 (addressing only the first three factors of minimum contacts analysis and not reaching fourth and fifth factors where first three factors not met).[11]

## III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss for Lack of Personal

---

[10]    The Court need not address the *Calder* "effects test" for Employee Defendants because, absent other contacts with Minnesota, the application of the *Calder* "effects test" is not sufficient on its own to establish specific personal jurisdiction. *See Johnson*, 614 F.3d at 797 (noting that "the *Calder* test [is] merely as an additional factor to consider when evaluating a defendant's relevant contacts with a forum state" and reaffirming prior case "declin[ing] to grant personal jurisdiction solely on the basis of forum state effects from an intentional tort" (citation omitted)).

In any event, nothing in the record indicates that Employee Defendants "efforts" to tortiously interfere with CS's prospective economic advantage "were exclusively, or even predominantly, targeted at [Minnesota] customers," which undermines any claim that Minnesota was the "focal point" of Employee Defendants' alleged tortious conduct. *See Fastpath, Inc. v. Arbela Techs. Corp.*, 953 F. Supp. 2d 971, 978 (S.D. Iowa 2013) (citation omitted).

[11]    In the event the Court concluded that it lacked personal jurisdiction over Defendants, Plaintiff requests that the Court transfer this case to either Washington or Michigan. (Pl.'s Opp'n Mem. at 29.) Because the Court retains jurisdiction over two of the seven defendants, the request for transfer is denied.

Jurisdiction (Doc. No. 24) is **GRANTED IN PART, AND DENIED IN PART**

**WITHOUT PREJUDICE,** as follows:

1.   The Court lacks personal jurisdiction over Defendants Bonnie Childs, Lynne Cox, Debra Dickerson, Michelle Boots, and Mary Ellsworth, and dismisses them from this case without prejudice;

2.   The Court exercises personal jurisdiction over Cruise & Travel Experts, Inc. with respect to every Count except Count Seven of Plaintiff's Complaint, and dismisses that claim only without prejudice;

3.   The Court denies Defendants' Motion to Dismiss in all other respects.

**IT IS SO ORDERED.**

Dated: August 11, 2020                         s/Susan Richard Nelson
                                               Susan Richard Nelson
                                               United States District Judge